UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THOMAS MILTON BENSON, JR., in his capacity as GRANTOR | *  CIVIL ACTION NO.  15-782 |
| | * |
| | *  SECTION "H" (2) |
| Plaintiff, | * |
| | *  JUDGE MILAZZO |
| VERSUS | * |
| | *  MAGISTRATE JUDGE WILKINSON |
| ROBERT A. ROSENTHAL, in his capacity as TRUSTEE | * |
| | * |
| | * |
| Defendant. | * |
| | * |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * | * |

## OPPOSITION TO MOTION TO COMPEL

Thomas Milton Benson, Jr., New Orleans Louisiana Saints, LLC and Louisiana Media Company oppose Robert A. Rosenthal's motion to compel responses to his document requests and subpoenas.  [Rec. Doc. 70].  Instead of limiting his requests to documents that are relevant to the value of the trust assets at issue, Rosenthal seeks to audit the operations of all of Mr. Benson's businesses.  Rosenthal's requests — 445 in all — go far beyond the scope of discovery permitted by Rule 26(b), and his apparent purpose is to harass Mr. Benson.

Nevertheless, Mr. Benson has produced over 32,000 pages of documents, and he has withheld only a small fraction of documents that are protected from discovery by the attorney-client privilege and the attorney work-product doctrine.  He has produced all relevant, responsive documents that are within his care, custody or control.

## PROCEDURAL HISTORY AND DISCOVERY AT ISSUE

In early December 2014, Mr. Benson consulted his attorney, Paul Cordes, regarding the succession plan for his businesses.  His consultations with Mr. Cordes culminated

in several actions by him, one of which was to exercise his right to reacquire assets from grantor trusts and grantor annuity trusts previously established by him.  The beneficiaries of the trusts are his daughter, Renee Benson, and his grandchildren, Rita Leblanc and Ryan Leblanc (the "3R's").  The trusts are subject to the Internal Revenue Code's grantor trust provisions, including 26 U.S.C. § 675(4), which allow Mr. Benson to reacquire from the trusts assets previously conveyed by him to the trusts in exchange for other property of equivalent value.

On January 12, 2015, Mr. Benson delivered to Rosenthal, Trustee of the grantor trusts, his Notice of Exchange.  [Rec. Doc. 1-21].  In exchange for the trust assets, Mr. Benson delivered promissory notes and other assets of equivalent value.  [*Id.*].  Because the trust assets are not publicly-traded, the Notice of Exchange necessarily contemplated subsequent valuations of the assets and notes, but it established January 1, 2015 as the effective date of the asset exchange.  [*Id.*].  Among the reacquired assets were units in Benson Football, LLC, which owns the Saints and Louisiana Media Company.  [*Id.*].

Soon thereafter, on January 22, 2015, the 3R's sued Mr. Benson in Civil District Court in Orleans Parish, seeking to have him interdicted, so that they could attempt to undo the asset exchange.  A day earlier, Renee had sued Mr. Benson in Texas to remove him as trustee and executor of his late wife's trust and estate, which held other substantial assets.

In a January 19, 2015 letter, Rosenthal's counsel, Kevin Kennedy, confirmed Mr. Benson's right to exchange trust assets: "Bobby [Rosenthal] acknowledges Mr. Benson's right under the agreements establishing the above-referenced trusts to reacquire or exchange trust assets by substituting other property of an equivalent value."  [Rec. Doc. 1-47].  However, in a follow-up February 27, 2015 letter, Mr. Kennedy contended there had not yet been an exchange of assets.  [Rec. Doc. 1-48].  He agreed that Rosenthal could accept a promissory note as

consideration for the exchange, but he said Rosenthal could not make the exchange until he received a valuation of the trust assets and security for the promissory notes. [*Id.*].

Rosenthal's response was an about-face from his previous handling of an exchange of trust assets in 2012, when he purchased from Mr. Benson many of the assets that Mr. Benson reacquired through the Notice of Exchange. [Rec. Docs. 1-12 at ¶5, 1-13 at ¶5, 1-14 ¶5].[1] In the 2012 transaction, Rosenthal used the same value adjustment mechanism — and the same valuation firm, Empire Valuation Consultants ("Empire") — that Mr. Benson used in the exchange at issue. In the 2012 transaction, Empire did not audit Mr. Benson's companies, as Rosenthal now seeks to do with his discovery. Moreover, the 2012 purchase agreements were effective upon their execution, even though subsequent valuations were to be done. [*Id.*].

The only issue in this case is whether the values of the trust assets and substitute assets are equivalent.

### A.   Rosenthal's Burdensome Document Requests to Mr. Benson.

Despite the limited scope of the disputed issues in this case, Rosenthal sought through discovery what has become an audit of every business owned by Mr. Benson. Rosenthal's first document request was reasonable; it sought documents provided to Empire for its valuations. Mr. Benson fully responded to that request.

---

[1]   The valuation adjustment clauses used by Rosenthal in purchasing assets states, in pertinent part, that the parties:

agree that Empire Valuation Consultants, LLC shall, as soon as reasonably practical, update the value of the Sold Assets as of the date of this Purchase Agreement and that ***the purchase price shall be adjusted as necessary, based upon the updated valuation***. Should the purchase price be adjusted, the principal of the Note shall be increased or decreased in accordance with the adjusted valuation of the Sold Assets and a revised Note and Collateral Assignment of Unit Shares shall be executed, ***effective as of the date of this Purchase Agreement.***

[Rec. Docs. 1-12 at ¶5, 1-13 at ¶5, 1-14 ¶5 (emphases supplied)].

1201545v4

Rosenthal's second document request was incredibly broad. It consisted of 43 requests for records that are mostly irrelevant and have no bearing on the value of the assets at issue. [Rec. Doc. 70-2]. Many of the requests have multiple parts and subparts that exponentially expand their breadth. Request Nos. 20-23 seek correspondence between *anyone* employed by Mr. Benson's companies and Mr. Cordes' law firm (Mr. Benson's attorneys) regarding as many as 8 separate topics related to the asset exchange. [*Id.*]. Those four items alone consist of over 30 separate requests. Similarly, Request No. 38 seeks financial statements and balance sheets for 2015 and 2016 for each of the "Benson Companies," which is defined to include 21 separate entities.

Mr. Benson delivered his written responses to Rosenthal's second request on November 30, 2015. [Rec. Doc. 70-3]. Mr. Benson raised various objections, *but he never objected that his companies' records were not within his care, custody or control*. His counsel endeavored to produce his companies' *relevant* documents that were located after a reasonable search. Considering the breadth of Rosenthal's requests, a reasonable search required considerable time and effort, and Mr. Benson's counsel could not possibly locate, review and produce all responsive documents within 30 days. Accordingly, Mr. Benson has done a rolling production, with tens of thousands of pages produced in December and over 10,000 more this year.

**B.      The Defendant's Avalanche of Subpoenas to Mr. Benson's Companies.**

In addition to his expansive requests to Mr. Benson, on or around December 16, 2015, Rosenthal served 12 of Mr. Benson's companies with subpoenas *duces tecum*, which consisted in the aggregate of 401 separate document requests. [Ex. A]. Many of the companies subpoenaed were already included in Mr. Rosenthal's second request, and many of the subpoenaed items were duplicative of his prior requests to Mr. Benson.

Separately, on or around December 29, 2015, Rowe served four of Mr. Benson's companies with subpoenas *duces tecum*, which consisted in the aggregate of 75 separate document requests.   [Ex. B].   As with Rosenthal's subpoenas, many of the subpoenaed companies were included in Rosenthal's document requests, and many of the subpoenaed items were duplicative of Rosenthal's requests to Mr. Benson.   Both Rosenthal and Rowe served subpoenas *duces tecum* on the Saints and Louisiana Media.

Because of Mr. Benson's control over the subpoenaed companies, Mr. Benson's counsel treated the subpoenas as supplemental document requests to Mr. Benson.   Objections to the subpoenas were served on January 14, 2016.   [Rec. Docs. 70-17, 70-18].   The return date for both sets of subpoenas (16 in all) was January 15, 2016, giving Mr. Benson's counsel only 30 days to respond to Rosenthal's 12 subpoenas and around 15 days to respond to Rowe's 4 subpoenas.   That is an incredibly small window in which to respond to 476 separate requests.

Combining Rosenthal's document requests to Mr. Benson and his subpoenas to Mr. Benson's companies, he has propounded 445 total requests.   Between Rosenthal and Rowe, they had propounded 520 total requests as of the filing of this motion.   Since then, Rowe has propounded another set of 12 document requests to Mr. Benson.   With all of their various parts and subparts, the document requests cover virtually the entirety of Mr. Benson's business activity, which consists of dozens of entities in Louisiana and Texas and thousands of employees.

C.   **Rosenthal Conferred Regarding His Requests to Mr. Benson, But Failed to Confer Regarding His Subpoenas.**

On January 4, 2016, counsel for Rosenthal and Mr. Benson conferred by telephone regarding only Mr. Benson's responses to Rosenthal's first and second document requests to Mr. Benson.   [Rec. Doc. 70 at 3].   Counsel did not confer regarding the subpoenas

- 5 -

because the January 15 return date had not yet passed.  In fact, Rosenthal's counsel *never* conferred with undersigned counsel regarding the subpoenas, as required by Rule 37.  The first indication that Rosenthal was dissatisfied with the subpoena responses was his Motion to Compel, filed on February 23.

On the other hand, Rowe's counsel, Thomas Flanagan, did confer with counsel for Mr. Benson by email dated January 29, 2015, and Mr. Flanagan limited Rowe's subpoenas. [Rec. Doc. 70-19 at 5-6].  Mr. Benson has since produced documents in his care, custody and control that are responsive to the subpoenas as limited by Mr. Flanagan, including Rowe's subpoenas to the Saints and Louisiana Media.

### D.    Mr. Benson Has Produced Over 32,000 Pages of Responsive Documents.

In an effort to produce documents in response to the 520 total document requests, Mr. Benson's attorneys have consulted with various officers of Mr. Benson's companies, searched potentially responsive electronic information, and reviewed tens of thousands of pages of potentially responsive records.  That process culminated in Mr. Benson making several document productions, totaling over 32,000 pages.  In fact, Mr. Benson produced over 19,000 pages before Rosenthal filed his motion to compel.

Rosenthal complains about the rolling nature of Mr. Benson's document productions, as though it has dragged on for years.  In reality, rolling productions of such volumes are the norm, and a huge number of documents have been produced in only a few months (despite the intervening Thanksgiving, Christmas, New Year's, and Mardi Gras holidays).  At this time, Mr. Benson's document production is essentially complete; the only documents that remain to be produced are a relative handful of documents (mostly documents requested by Mr. Flanagan in conferring with undersigned counsel about Rowe's subpoenas) that will be produced shortly.

## LAW AND ARGUMENT

Under the guise of valuing the trust assets and promissory notes, Rosenthal is attempting to audit every aspect of Mr. Benson's business operations.  Rosenthal even admits that he intends to review all of the data underlying the financial statements for Mr. Benson's companies to determine if the information is accurate.  [Rec. Doc. 70-1 at 16].  That is not a reasonable approach to valuing the trust assets and promissory notes, and it is not even the approach that Rosenthal used for a previous transaction with the trust.  There has been no indication that the companies' financial records are inaccurate.  Indeed, many of the key records (such as those from the Saints and Pelicans) have already been audited by a leading auditing firm.  Rosenthal is harassing Mr. Benson with burdensome requests for documents that are mostly irrelevant.

Mr. Benson has, however, produced all responsive documents within his care, custody or control, except for a relatively small number of documents that are protected from disclosure by the attorney-client privilege and/or the work product doctrine.  Mr. Benson has more than satisfied his discovery obligations.

## I.     The Motion to Compel is Moot as to Most of the Documents Requests.

Rosenthal's motion seeks to compel a response to the following document requests in Rosenthal's second document request to Mr. Benson:  2, 4-11, 16-17, 20-26, 33 and 38.  [Rec. Doc 70-1 at 9].  However, with Mr. Benson's latest document production, he has produced all responsive, non-privileged documents in his care, custody or control that he has located in response to request numbers 2, 4-11 and 26.  The Motion to Compel is moot as to those requests because Mr. Benson does not have additional documents to produce.

## II.     Mr. Benson Has Properly Objected or Asserted Privileges in Response to the Remaining Requests.

As for the other requests, as explained below, Mr. Benson has either objected to producing the requested documents or asserted a privilege against disclosure of the documents.

### Request for Production Nos. 16 and 17

Request Nos. 16 and 17 seek documents relating to sales of 15 other NFL teams, dating back as far as 1999, and 12 other NBA teams, dating back to 2010.  [Rec. Doc. 70-3 at 12-13].  Mr. Benson objected to these requests as overly broad and unduly burdensome because they involve transactions that have no relevance to the 2015 valuation of the Saints and Pelicans. [*Id.*].  Mr. Benson further objected that some responsive documents are in the public domain and are thus equally available to Mr. Rosenthal (team sales are typically confidential and the only available information is usually that which is in the public domain).  [*Id.*].

Subject to his objections, Mr. Benson produced (in December 2015) documents responsive to Requests 16 and 17, consisting of information regarding other recent transactions involving NFL/NBA franchises compiled by Empire.   Mr. Benson also produced the sale agreement whereby he acquired the NBA Hornets franchise (now the Pelicans).  Mr. Benson's response is more than sufficient.  He should not be required to scour his companies' files for any shred of additional, marginally-relevant information, especially when the subject transactions occurred up to a decade and half ago.[2]

---

[2]        In response to a request from counsel for Rowe, a Pelicans executive inquired of the NBA whether the NBA would consent to disclose information relating to sales of interests in NBA teams.  The Pelicans were informed by the NBA that the NBA would not consent to disclosure.

1201545v4

**Request for Production Nos. 20 and 21**

Request Nos. 20 and 21 seek correspondence from December 1, 2014 to present among Mr. Benson, employees for his companies, and Mr. Benson's attorneys — Mr. Cordes and others at his law firm — related to the exchange.  [*Id.* at 15-16].  Mr. Benson objected to the extent that the requests seek documents protected by the attorney-client privilege and the attorney work product doctrine.  [*Id.*].

Mr. Benson has not asserted privilege as to any documents pre-dating December, 2014.  He has asserted privilege only as to documents dating from December 2014, when Mr. Cordes began consulting with Mr. Benson regarding the exchange.  Mr. Benson has logged all privileged documents withheld up to the date of the filing of this lawsuit.  These issues are discussed in depth below.

Notwithstanding his objections, Mr. Benson has produced, without regard to the date thereof, all correspondence from Mr. Cordes and his law firm to Empire in which Empire was provided facts, data or assumptions used for its valuations.  Any other communications regarding the exchange are not relevant to the value of the trust assets or substitute assets as of January 1, 2015 because none of the communications could possibly affect the value of the assets or the notes.

**Request for Production Nos. 22 and 23**

Request Nos. 22 and 23 seek correspondence between Empire and Mr. Cordes' law firm related to the exchange, and the trust assets and substitute assets at issue.  [Rec. Doc. 70-3 at 16-17].  Mr. Benson objected to the extent these requests call for production of documents protected from disclosure by the attorney-client privilege or the attorney work product doctrine.  [*Id.*].  The applicability of those protections is discussed in depth below.

1201545v4

Notwithstanding his objections, Mr. Benson has produced, without regard to the date thereof, all correspondence by which his attorneys or officers of his companies supplied facts, data or assumptions to Empire.   Any other communications regarding the notice of exchange are not relevant to the value of the trust assets or the notes exchanged by Mr. Benson as of January 1, 2015 because none of the communications could possibly affect those values.

### Request for Production Nos. 24 and 25

Request No. 24 seeks correspondence from Dennis Lauscha (Saints and Pelicans President) regarding the exchange.   [*Id.* at 18].   Mr. Benson objected that the request is vague because it identifies only one participant in the requested correspondence.   [*Id.*].   Subject to his objection, Mr. Benson produced correspondence between Mr. Lauscha and Empire in which Mr. Lauscha supplied facts, data or assumptions to Empire.

Request No. 25 seeks correspondence from Mr. Benson's CPA, Joe Feuge, regarding the exchange.   [*Id.*].   Mr. Benson has produced emails whereby Mr. Feuge provided facts, data or assumptions to Empire, and only withheld a few documents that are protected by the work product doctrine.   These documents are reflected on his privilege log.

### Request for Production No. 33

Request No. 33 seeks a copy of the Marital Deduction Trust established in Mr. Benson's will for the benefit of his wife, citing a reference to it in Empire's valuation reports. [Rec. Doc. 70-3 at 21-22].   Mr. Benson objected to the request because the marital deduction trust is a component of his will.   [*Id.*].   The only significance of the marital deduction trust to this case is that Mr. Benson's estate, which (after his death) will be responsible for repaying the promissory notes delivered in the exchange, will not be burdened with an estate tax for assets left to his wife, Gayle.   Section 2056 of the Internal Revenue Code provides that "the value of any

- 10 -

interest in property which passes or has passed from the decedent to his surviving spouse" is deducted from the taxable estate.  In other words, assets left by Mr. Benson to Gayle will not create liability for estate tax during her lifetime.

Mr. Benson's will, as is any person's will, is private.  Production of his will is an unnecessary and unwarranted intrusion into his privacy.  Mr. Benson's expert witness, Kevin Kane of Empire, did not review the will but was simply advised by Mr. Cordes that it leaves the bulk of Mr. Benson's estate to Gayle.  Mr. Cordes was the notary public before whom the will was executed, he will be a witness in this case, and he can testify to that fact.  That is more than sufficient to provide Rosenthal's experts with the information they need, while preserving the privacy of Mr. Benson's will, and it need not be produced.

Alternatively, in the event that the Court does require production of the marital deduction trust, it should permit production of only the specific pages of the will referring to the marital trust, with all other material redacted.

### Request for Production No. 38

Request No. 38 seeks 2015-16 financial statements and balance sheets for each of the "Benson Companies."   [Rec. Doc. 70-3 at 24].   This request potentially encompasses financial statements for 21 separate entities, and Mr. Benson objected that Rosenthal's definition of "Benson Companies" is vague because it is unclear which companies are included.   [*Id.*].  Mr. Benson further explained that Bensco, Inc. and the Zelia entities used a calendar year, and their financial statements for calendar year 2015 had not yet been prepared as of his November 30, 2015 response.  Mr. Benson does not yet have balance sheets for 2016.  Subject to his objection, Mr. Benson has produced the following financial records for 2015:

- New Orleans Louisiana Saints, LLC audited financial statements for fiscal year ended March 31, 2015;

1201545v4

- Benson Basketball, LLC audited financial statements for fiscal year ended June 30, 2015, and a balance sheet as of December 31, 2015;

- Benson Football Balance Sheets as of March 31 (fiscal year close) and December 31, 2015;

- New Orleans Pelicans NBA, LLC financial statements for fiscal year ended June 30, 2015;

- Tom Benson's personal financial statements as of December 31, 2015;

- Zelia, LLC financial statements as of December 31, 2015;

- Zelia CNP, LLC financial statements as of December 31, 2015; and

- Louisiana Media Company financial statements as of March 31, 2015.

Rosenthal and his experts have been provided with more than enough financial information to prepare valuations. But nothing is ever enough for Rosenthal.

## III. Rosenthal's Motion to Compel a Response to the Subpoenas is Procedurally Deficient Because He Failed to Meet and Confer.

Rule 37(a)(1) requires that a motion to compel "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). Although Rosenthal's counsel conferred with Mr. Benson's counsel on January 4, 2016 regarding his responses to document requests, Rosenthal's counsel *never* conferred regarding the Saints and Louisiana Media's responses to his subpoenas. Rosenthal failed to comply with Rule 37(a)(1), and this Court should not entertain his motion with respect to the subpoenas until he confers with their counsel. *See, e.g., Forever Green Athletic Fields, Inc. v. Babcock Law Firm, LLC*, 2014 U.S. Dist. LEXIS 90566 (M. D. La. 7/2/2014).

Rosenthal's failure to confer is particularly egregious considering Mr. Flanagan's conference with undersigned counsel regarding the subpoenas that Rowe separately issued to the Saints and Louisiana Media. Mr. Flanagan limited Rowe's subpoenas, and undersigned counsel

reasonably believed that Rosenthal would be satisfied with the Saints' and Louisiana Media's responses to those subpoenas as limited by Mr. Flanagan, especially considering Rosenthal's counsel's silence regarding their responses to his subpoenas.

**IV.    This Court Lacks Jurisdiction to Compel the Saints to Respond to the Subpoena.**

Rosenthal's motion, with respect to the Saints, suffers from yet another procedural deficiency: it was filed in the wrong court.   Rule 45(d)(2)(B) provides that "if an objection is made, the following rules apply:  (i) at any time, on notice to the commanded person, the serving party may move *the court for the district where compliance is required* for an order compelling production or inspection."   Fed. R. Civ. P. 45(d)(2)(B)(i) (emphasis added).   Consistently, Rule 37(a)(2) provides that "a motion for an order to a non-party must be made in the court where the discovery is or will be taken."   Fed. R. Civ. P. 37(a)(2)); *see also, Paso Del Norte Motors, LP v. Kia Motors of Am., Inc.*, 2015 U.S. Dist. LEXIS 109351 (N. D. Tex. 8/9/2015).

Rosenthal's subpoena to the Saints was served on its registered agent, Stanley Rosenberg, in San Antonio.  [Rec. Doc. 70-14 at 4].  The subpoena demands production of the requested documents at the law office of Kevin Kennedy in San Antonio.  [*Id.* at 3].  San Antonio is not within this District.  Therefore, this Court lacks jurisdiction to compel the Saints to respond to the subpoena.

**V.    The Subpoenas to the Saints and Louisiana Media are Largely Duplicative of Rosenthal's Requests to Mr. Benson and Seek Irrelevant Documents.**

The Saints and Louisiana Media objected to Rosenthal's subpoenas on the grounds that they were largely duplicative of Rosenthal's second document request.   For example, Item No. 1 in the Saints subpoena is duplicative of request No. 16 in Rosenthal's requests to Mr. Benson.  [Rec. Doc. 70-17 at 2].  Other duplicative items in the Saints' subpoena include items 2, 3-12, 15, 40-42, and 44.  Mr. Benson had never objected that the Saints' records

were not within his care, custody or control.  Rosenthal's duplicative requests to the Saints were apparently for the purpose of harassing Mr. Benson and the Saints.

The Saints and Louisiana Media also objected that the relevant data in the requested documents is aggregated into the financial data that Mr. Benson has already produced in this case.  Relevant data is data that affects the valuation of the trust assets and the promissory notes as of January 1, 2015.  That data would already have been incorporated when the financial records were prepared, and any effect the data would have on the value of the companies would be reflected in the resulting financial statements.  For example, Item No. 6 in the subpoena to Louisiana Media requests documents reflecting non-recurring or unusual revenue for the last 5 years.  [Rec. Doc. 70-15 at 11].  All of Louisiana Media's revenues are reflected in its income statements.   Thus, records establishing that certain income items are "non-recurring" or "unusual" are superfluous and not relevant for the purpose of valuing Louisiana Media.

Rosenthal contends he is "not obligated to accept the financial statements without the ability to analyze the underlying data to determine whether the information is, in fact, accurate."  [Rec. Doc. 70-1 at 16].  But he has not raised any issue in his pleadings that would call into question the accuracy of Mr. Benson's companies' financial records.  That would be the subject of a financial audit, which this lawsuit does not require (and which has already been done for many of the Saints' records).  Rosenthal is not entitled to go behind the financial records, the accuracy of which has never been questioned, under the guise of valuing the companies.

## VI.    Mr. Benson has Properly Asserted Attorney-Client and Work-Product Privileges Over Relatively Few Documents.

Mr. Benson has withheld some communications on grounds that they are protected from disclosure by the attorney-client privilege or were prepared in anticipation of litigation, or both.  Most of the withheld communications are between his attorneys and Dennis

Lauscha, Ed Lang or Vicky Neumeyer.  Mr. Lauscha is President of the Saints and the Pelicans; Mr. Lang is the CFO; and Ms. Neumeyer is General Counsel (collectively, the "Saints Executives").  For the purpose of this lawsuit, Mr. Cordes' law firm and the Saints Executives have communicated with each other in order to represent Mr. Benson's interests in this case. Other withheld communications consist of those between his attorneys and Empire on the grounds that the communications consisted of work product and did not entail facts, data or assumptions provided to Empire for its valuations.

A reasonable anticipation of litigation with Rosenthal and the 3R's arose in early December 2014.  Mr. Cordes met, spoke and consulted with Mr. Benson on multiple occasions beginning on December 3, 2014 and continuing during the weeks thereafter.  At Mr. Benson's request, Mr. Cordes also had discussions with Mr. Lauscha regarding plans to reacquire trust assets during December 2014.

On December 27, 2014, Mr. Cordes met with Mr. Benson.  On that date, Mr. Benson informed Mr. Cordes he wished to reacquire the trust assets.  That same day, Mr. Benson sent a letter to the 3R's severing his personal communications with them.  [Ex. C]. Soon thereafter, he also relieved them of any authority over personnel in his companies, essentially firing them.

Mr. Cordes and his firm finalized the documentation needed to effect Mr. Benson's decision.  Mr. Cordes met with Mr. Benson on January 3 and 5-7, 2015 to discuss the documents.  The Notice of Exchange documents were signed by Mr. Benson on or about January 10, 2015, and they were sent to Rosenthal the next day.

It was reasonably and objectively foreseeable that reacquiring the trust assets, severing personal communications, and firing the 3R's from positions of responsibility in his

1201545v4

companies could result in litigation.   That likelihood was borne out: the 3R's response was all-out legal warfare.   On January 21, 2015, Renee sued Mr. Benson in Texas to remove him as trustee of his late wife's trust – a trust holding assets he had created, built, and grown substantially while serving as trustee (gratis) for decades.   The following day, the 3R's sued to interdict Mr. Benson in Civil District Court, Orleans Parish.   Shortly afterwards, Rosenthal rejected the Notice of Exchange.  [Rec. Docs. 1-47, 1-48].

A.     **Mr. Benson Has Logged All of the Relevant Pre-Suit Privileged Documents He Withheld from Production.**

Mr. Benson produced a log of all of the documents that he has withheld on the grounds that they are protected from disclosure, either as attorney-client communications, work product, or both.  The time parameters for the log are December 5, 2014 to March 11, 2015, the date that Mr. Benson was forced to file this lawsuit against Rosenthal.

Rosenthal attacks Mr. Benson's log of privileged documents, suggesting that he has withheld scores of privileged documents dating back to 2009 but failed to log them.  [Rec. Doc. 70-1 at 18].  That is not true.  The only pre-suit documents Mr. Benson has withheld are those identified in his privilege log.  As Rosenthal points out, the earliest document is dated December 5, 2014.  [*Id.*; Rec. Doc. 70-20 (Privilege Log)].  Mr. Benson has not withheld *any* documents before that date, and Rosenthal's counsel was advised of this multiple times, once at the January 4 Rule 37 conference, and again by letter dated January 28, 2016, stating, "We will produce a privilege log for documents pre-dating this lawsuit that are responsive to your requests that are withheld on the basis of a claim of a privilege or immunity."  [Rec. Doc. 70-13 at 1]. Mr. Benson's counsel has never said they would withhold documents predating December 2014.

Consistent with his counsel's correspondence, Mr. Benson has produced *all* responsive, non-privileged documents in his possession that predate December 5, 2014. Those

communications include many pre-December 2014 communications between Mr. Cordes' law firm and the Saints Executives, which Rosenthal baselessly claims have been improperly withheld.  Nothing before December 2014 has been withheld.  Thus, there is nothing before that date to log.

Mr. Rosenthal also complains that Mr. Benson has not logged privileged communications that occurred after this lawsuit was filed on March 11, 2015.  Rosenthal concedes that post-lawsuit attorney-client communications between Mr. Benson and his attorneys need not be logged [Rec. Doc. 70-1 at 19], but he appears to insist that all post-filing communications withheld as work product must be logged so that Rosenthal can assess the application of the work product protection.  Rosenthal relies on *Verret v. State Farm Fire and Cas. Co.*, 2014 WL 460933, at *2 (E.D. La. 2/5/2014), in which Magistrate Wilkinson explained that just because a document is prepared after a lawsuit is filed, the document is not necessarily prepared in anticipation of litigation.  The primary motivation behind the preparation of the document is determinative, and if that motivation was to serve ordinary business purposes, as opposed to aiding in litigation, then it is not protected.  *Verret*, 2014 WL 460933 at *2.

There is no legitimate dispute that all post-filing, withheld communications in this case have been in furtherance of pending litigation.  As an initial matter, the central issue in this lawsuit is the value of the trust assets and substitute assets in the exchange.  Post-filing work product communications could not have affected the value of the assets as of the January 1, 2015 effective date of the exchange, and they are therefore not even relevant and subject to discovery, with one exception:  Mr. Benson is not withholding, and has in fact produced, post-filing communications by which Empire was supplied with facts, data and assumptions for its valuations.  [Rec. Doc. 70-21].

- 17 -

But even if post-filing communications were relevant, once Mr. Benson filed suit, his attorneys' and his experts' communications regarding the asset and note values were necessarily in anticipation of the trial on those values.  The primary motivation behind all of the post-filing communications was to facilitate Mr. Benson's establishment of the value of the trust assets and the substitute assets.  There was no ordinary business purpose for the post-filing communications, and Rosenthal has offered none.  While it is true that Mr. Benson's attorneys would have communicated with Empire about the value of the trust assets even if litigation were not anticipated or pending, the communications would not have been in the adversarial context of this litigation, with an eye towards presenting the experts' testimony at trial.  Because the lawsuit was filed, all withheld post-filing communications have been in the context of, and motivated by, trial preparation.  The communications are thus protected work product.

Finally, it would be burdensome and wasteful for Mr. Benson to log every work product communication that his attorneys, representatives and experts have had since the lawsuit was filed.  Those communications occur almost daily — some days dozens of emails are sent — and logging them would hinder trial preparation.  It would also chill their communications because they would be hesitant to communicate to avoid the burden of logging the communications.  That sort of burdensome logging is useless and not required by Rule 26.

**B.    Litigation Could Be Reasonably Anticipated by Early December 2014.**

Rosenthal contends that communications between Mr. Benson's attorneys and Empire before Rosenthal's February 27, 2015 rejection of Mr. Benson's notice of exchange were not in anticipation of litigation because Mr. Benson would have commissioned Empire to create its valuation reports even if Rosenthal had accepted the Notice of Exchange.  [Rec. Doc. 70-1 at 22].  Rosenthal ignores the circumstances and context in which the valuations were done.

1201545v4

The relationship between Mr. Benson and the 3R's ruptured early in December 2014.  The Notice of Exchange was the culmination of the process, beginning in early December 2014, to remove the 3R's from future ownership in his companies upon his death.  The trusts' ownership interests were no doubt personally significant and material to the 3R's.  Litigation over such a sea change was foreseeable, and perhaps even inevitable.

Empire would have prepared valuations even if Mr. Benson had not sued Rosenthal, but communications with Empire would not have been made with the expectation that its representatives would testify at trial to support the valuations.  Because litigation over the trust asset values was foreseeable, his attorneys' and employees' communications with Empire (the earliest of which was January 20, 2015) were necessarily for the purpose of preparing a valuation that would be litigated.  Thus, his communications with Empire were for the primary purpose of preparing for litigation and are work product.

### C.     Communications between Empire and Mr. Benson's Representatives Are Protected Work Product.

Rosenthal contends generally that communications between Empire and the Saints Executives are not protected by Rules 26(b)(3) or (b)(4) because they are communications between an expert and non-attorneys, rather than an expert and an attorney.  [Rec. Doc. 70-1 at 22-23].  Rosenthal contends Rules 26(b)(3) and (b)(4) should be read strictly to protect *only* communications between an expert and an attorney and no one else.

Once again, Rosenthal fails to establish how communications between Empire and Mr. Lauscha, or other third parties, regarding trial preparation are even relevant to the value of the trust assets and the substitute assets as of January 1, 2015.  Mr. Benson has not asserted a privilege over communications with Empire by which he, his attorneys or officers of his companies furnished to Empire facts, data or assumptions for use in its valuations.   Any

- 19 -

communications other than those would have no effect on the values, and therefore are neither relevant nor discoverable.

But even assuming communications with Empire that do not supply facts, data or assumptions are relevant, they are still work product. Rule 26(b)(3) protects documents "prepared in anticipation of litigation or for trial by or for another party *or its representative* (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3) (emphasis added). For the limited purpose of this litigation, the Saints Executives are necessary conduits for communications with Mr. Benson, and they are communicating with Mr. Benson's attorneys and experts on his behalf. Their communications with Empire are therefore between a party representative and the expert. Rosenthal knows this because he has been largely mediating this case with Mr. Lauscha (without counsel) and never complained that Mr. Lauscha is improperly participating in the mediation. Mr. Benson's representatives' communications with Empire are therefore documents prepared *by a party* in anticipation of litigation or for trial and are protected from discovery under Rule 26(b)(3).

Rosenthal relies on a trio of cases from the Ninth, Tenth and Eleventh Circuits holding that expert communications with non-attorneys are not protected work product, but Rosenthal is expanding those cases beyond their facts to try to get around Rule 26(b)(3). *See, In re: Application of Republic of Ecuador*, 735 F. 3d 1179 (10th Cir. 2013) ("Bjorkman"); *Republic of Ecuador v. Hinchee*, 741 F. 3d 1185 (11th Cir. 2013); *Republic of Ecuador v. Mackay*, 742 F. 3d 860 (9th Cir. 2014). Those cases addressed communications between Chevron's experts and non-attorneys who were neither parties nor representatives of parties to the lawsuit. For example, in *Bjorkman*, which Rosenthal cites repeatedly, the Tenth Circuit examined communications from "lawyers, in-house scientists, consultants, and expert witnesses." 735

- 20 -

F. 3d at 1181.  The court did not identify the non-attorney scientists, consultants and expert witnesses as party representatives for Chevron, and for a massive corporation like Chevron, it is unlikely they would be party representatives.  Similarly, in *Mackay*, the communications at issue do not appear to be between the experts and the party that hired them.  742 F. 3d at 863-64. Those cases, therefore, should not be expanded to allow discovery of communications between a *party* (or his representatives) and his expert.

Moreover, Rule 26(b)(4) provides that "Rules 26(b)(3)(A) and (B) protect communications between the party's attorney and any witness required to provide a report under Rule 26(a)(2)(B) . . ."  Fed. R. Civ. P. 26(b)(4).  The 2010 Advisory Committee Notes for Rule 26(b)(4) explain that "The protection for communications between the retained expert and 'the party's attorney' should be applied in a realistic manner, and often would not be limited to communications with a single lawyer or a single law firm . . . **Other situations may also justify a pragmatic application of the 'party's attorney' concept**."  Fed. R. Civ. P. 26, 2010 Adv. Comm. Note (emphasis supplied).

Rosenthal's application of these rules defies pragmatism and logic.  Rosenthal concedes Mr. Benson's communications with his attorneys are protected by the attorney-client privilege; and Rule 26(b)(4) protects his attorneys' communications with his experts.  If Rosenthal's interpretation prevails, in order for Mr. Benson's representatives to have protected communications with his experts to prepare for trial, they must have Mr. Benson's attorneys relay their communications to the experts.  But if they speak directly to his experts, or even speak to his attorneys and the experts together, the communication is discoverable.  That makes no sense and would make preparation for trial nearly impossible, particularly in this case where the experts' opinions on the values of the trust assets and promissory notes are the crux of the

1201545v4

case.  The necessary pragmatic application of Rule 26(b)(4) calls for work product protection against disclosures of Mr. Benson's representatives' communications with his experts.

### D.    Communications between Mr. Benson's Attorneys and the Saints Executives are Privileged.

Rosenthal contends communications between Mr. Benson's attorneys and employees of his companies are not privileged.  [Rec. Doc. 70-1 at 24].  Rosenthal does not identify particular communications from Mr. Benson's privilege log (which are the only documents withheld on the basis of attorney-client privilege), but presumably he is referring to communications with the Saints Executives that are listed on the log.  Mr. Benson's attorneys' communications with these individuals on his behalf are confidential attorney-client communications because communicating through these individuals is reasonably necessary to facilitate the transmission of the communication to Mr. Benson.

Article 506 of Louisiana's Code of Evidence establishes a privilege for confidential communications between an attorney and his client.  La. Code Evid. art. 506(B).  Article 506 says that a communication is confidential if it is not intended to be to disclosed to persons other than "(a) Those to whom disclosure is made in furtherance of obtaining or rendering professional legal services for the client" and "(b) Those reasonably necessary for the transmission of the communication."  *Id.*

Mr. Benson, 88, presides over a veritable business empire, consisting of businesses in Louisiana and Texas, which employ thousands of employees.  He cannot reasonably personally communicate with every employee about every aspect of his operations.  He relies on the officers of his companies to communicate with his employees and report to him.

The same is true for communications with his attorneys.  Mr. Benson cannot reasonably communicate directly with his attorneys regarding every aspect of this lawsuit.  He

relies on officers of his companies, particularly the Saints Executives, to facilitate his communications with his attorneys.  Under article 506, they are individuals "to whom disclosure is made in furtherance of obtaining or rendering professional legal services" for Mr. Benson, and they are "reasonably necessary for the transmission of" communications between Mr. Benson and his attorneys.

As an example, Mr. Benson could not respond to Rosenthal's Request for Production No. 38, which asks for the 2015 and 2016 financial statements and balance sheets for each of his companies, without having his attorneys communicate with the officers of his companies who maintain these records.  [Rec. Doc. 70-3 at 24].  Mr. Benson could not personally go collect every single document responsive to the 520 discovery requests from Rosenthal and Rowe in this case.  He must rely on others to facilitate his communications with his attorneys regarding the issues in this lawsuit. Under article 506, these communications are privileged.  Is Rosenthal's position really that an 88-year old man who presides over a business empire must personally handle every facet of litigation and discovery, or waive privilege?

Incredibly, Rosenthal and Rowe recently asserted privilege as to their communications with the 3R's.  [Ex. D at 11 (Response to Request No. 3); Ex. E at 5 (Response to Request No. 3)].  They apparently take an expansive view of privilege for themselves, and an exceedingly narrow view for Mr. Benson.

**E.      Rosenthal and Rowe Are No Longer Owners of the Exchanged Trust Assets and Thus Have No Right to Privileged Communications.**

Rosenthal suggests that he is still an owner of interests reacquired from the trusts by Mr. Benson and therefore communications between Mr. Benson's attorneys and officers of his companies are not privileged.  [Rec. Doc. 70-1 at 25].  Rosenthal is wrong for two reasons.

- 23 -

First, the Notice of Exchange was made effective as of January 1, 2015. While the exchange contemplates possible adjustment of the principal of the promissory notes to ensure equivalent value is given, the exchange was effective as of January 1, 2015. That is the protocol that Rosenthal previously followed in a similar trust asset exchange in 2012, and it is disingenuous for him to now contend that the exchange is not effective until the valuation is completed. Because the exchange was effective, the trusts no longer own the exchanged interests in Mr. Benson's companies.

But even assuming the trusts still held ownership interests, there is no dispute that they are non-controlling owners. As the Fifth Circuit has explained, when there is a dispute between non-controlling shareholders and controlling shareholders, the controlling shareholders' communications with their attorneys and officers of the company regarding the lawsuit are privileged. *Garner v. Wolfinbarger*, 430 F. 2d 1093, 1103 (5th Cir. 1970). Non-controlling shareholders do have the opportunity to show good cause why they need the requested communications, but Rosenthal has made no effort to do that here.

There is no good cause for Rosenthal to discover communications between Mr. Benson's companies' officers and Mr. Benson's attorneys because they have no effect on the value of the trust assets. The value will not change no matter what they say. The only reason for Rosenthal to seek these privileged communications is to harass Mr. Benson and try to gain an unfair advantage in this lawsuit. The Court should not allow it.

## CONCLUSION

For these reasons, Mr. Benson, the Saints and Louisiana Media respectfully request that the Court deny Rosenthal's Motion to Compel.

Respectfully submitted,

*/s/ Phillip A. Wittmann*
Phillip A. Wittmann, TA, La. Bar No. 13625
James C. Gulotta, Jr., La. Bar No. 06590
Andrew D. Mendez, La. Bar No. 26686
John Mark Fezio, La. Bar. No. 29861
Matthew S. Almon, La. Bar No. 31013
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130-3588
Telephone: (504) 581-3200
Facsimile: (504) 581-3361

*Attorneys for Thomas Milton Benson, Jr., New Orleans Louisiana Saints, LLC and Louisiana Media Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Opposition to Motion to Compel was filed electronically with the Clerk of Court using the CM/ECF system this 8th day of March, 2016. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

*/s/ Phillip A. Wittmann*

1201545v4