## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **THOMAS MILTON BENSON, JR.**, in his capacity as **GRANTOR** | * | **CIVIL ACTION NO. 15-782** |
| | * | |
| | * | **SECTION: H** |
| **VERSUS** | * | |
| | * | **JUDGE: MILAZZO** |
| **ROBERT A. ROSENTHAL**, in his capacity as **TRUSTEE** | * | |
| | * | **MAG. DIV.: 2** |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * | | **MAG. JUDGE: WILKINSON** |

### ROWE'S OPPOSITION TO BENSON'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY

Defendant Mary R. Rowe respectfully submits this memorandum in opposition to the plaintiff's motion *in limine* to exclude expert testimony.

## I.  INTRODUCTION

The plaintiff, Thomas Milton Benson, Jr., makes a procedural argument in an effort to exclude the testimony of lending expert David P. Shearrow. The argument that Shearrow was not expressly designated on Rowe's witness list on April 1 ignores that the parties, with the Court's approval, pushed back the expert deadline by two weeks. This made Rowe's expert reports due two weeks *after* the witness lists, leaving open the possibility that an expert witness might be designated after that deadline. In fact, Rowe's April 1 witness list specifically noted that she might call any expert witness designated by April 15 in accordance with the new deadline. In any event, Benson's procedural argument disregards the controlling law outlined by the Fifth Circuit in *Betzel v. State Farm*. Benson does not allege that the designation of Shearrow as an expert witness caused him any prejudice. He received Shearrow's report on the same day he received the other

defense expert reports, and he deposed Shearrow during the same week he deposed all other experts in this case.

On the merits, Benson argues that Shearrow's report will not be relevant to any issue in this case if Rowe's Rule 12(c) motion is denied. He reasons that, should the Court deny Rowe's motion, it would necessarily determine that his tendering promissory notes in exchange for the trusts' corpus was not a "loan" in any sense. Benson is mistaken. He previously argued that Rowe had discretion to reject only a "grantor loan," *i.e.*, a loan without adequate security or interest. Rowe contended that, under the plain language of the 2012 Trusts, she has discretion to make (or not make) a loan of any kind. If the Court denies Rowe's motion, it would simply mean that a fact issue exists as to whether Benson's notes bear adequate interest or are properly secured. It will not change the underlying reality that Benson seeks to reacquire trust assets on credit.

Benson's own expert treated the promissory notes as an extension of credit. He reviewed corporate bonds and mortgage loans in appraising the notes. He also analyzed Benson's creditworthiness and admitted that Benson's ability to impair the collateral would affect the value of the notes. Shearrow's testimony on these subjects is probative and admissible. He will analyze the unconventional structure of the notes, the vulnerabilities in the collateral assignments, and the impediments to foreclosure in case of default—all of which increase risk to the creditor. Thus, even if the Court should deny Rowe's Rule 12(c) motion and hold that a trustee has no discretion to reject this type of loan, that decision would not eliminate the risk of Benson's defaulting on the notes, nor would it cure any deficiencies in the notes or collateral assignments.

The Court should reject Benson's flawed reasoning and deny his motion to exclude Shearrow's testimony.

## II.   BACKGROUND

### A.   The transaction Benson proposes is an extension of credit in which Benson promises to repay a debt in 25 years.

In late 2012, Benson established (1) the Renee Benson 2012 Irrevocable Trust, (2) the Rita Benson LeBlanc 2012 Irrevocable Trust, and (3) the Ryan LeBlanc 2012 Irrevocable Trust ("2012 Trusts").[1] The trusts hold non-voting units of Benson Basketball, LLC, and Benson Football, LLC.[2]

In early 2015, Benson's counsel sent to Robert A. Rosenthal a "notice of exchange."[3] With respect to the 2012 Trusts, the notice purported to take back all of the units of Benson Football and Benson Basketball held by those trusts.[4] Doing so would result in a massive financial obligation to the trusts. Instead of paying that obligation with cash, Benson proposed debt instruments: promissory notes purportedly secured by the assets he sought to reacquire. He delivered actual notes about two weeks later but claimed that the transaction had retroactive effect.

Several months later, Benson delivered new promissory notes to Rowe, the successor trus-

---

[1]   Renee Benson 2012 Irrevocable Trust Agreement; Rita Benson LeBlanc 2012 Irrevocable Trust Agreement; Ryan LeBlanc 2012 Irrevocable Trust Agreement (Rec. Docs. 1-6 to 1-8). Benson created five additional trusts for which Robert A. Rosenthal is the trustee.

[2]   *Id.* Schedule A; Benson Basketball, LLC, through its subsidiary, owns the New Orleans Pelicans. Complaint, Rec. Doc. 1, ¶ 22. Benson Football, LLC, through its subsidiary, owns the New Orleans Saints. Complaint, Rec. Doc. 1, ¶ 24.

[3]   Notice of exchange, p. 2 (Rec. Doc. 1-21); Complaint, Rec. Doc. 1, ¶ 47. Rosenthal later appointed Rowe as successor trustee of the 2012 Trusts.

[4]   Notice of exchange, §§ 1.0-1.2.

tee for the 2012 Trusts.[5] Each promissory note provided for an annual payment of interest at a rate of 4%.[6] The principal balance would not become due until December 31, 2039.[7]

Collateral assignments accompanied the notes. They stated that Benson had assigned a security interest in certain collateral in order to secure his debt to the trusts.[8] The ostensible collateral is the interest in Benson Basketball and Benson Football owned by the 2012 Trusts. The collateral assignments initially provide that, should there be a default in the payment of the notes, "the Assignee [the 2012 Trusts] may elect to sell, lease, or otherwise dispose of all or any part of the Collateral."[9] That ostensible right was limited, however. Because transferring and encumbering units of Benson Basketball and Benson Football implicate NBA and NFL regulations, the collateral assignments expressly note that—in the event of any conflict or inconsistency—NFL or NBA rules would control.[10]

> **B.    The 2009 Trusts previously used promissory notes to purchase units of Benson Football from Benson; all parties treated it as an extension of credit, and the NFL limited Benson's ability to sell the notes or foreclose on the collateral.**

In 2009, Benson established the Renee Benson 2009 Irrevocable Trust, the Rita Benson LeBlanc 2009 Irrevocable Trust, and the Ryan LeBlanc 2009 Irrevocable Trust ("2009

---

[5]    Amended complaint, Rec. Doc. 48, ¶ 78. These notes purported to replace the notes delivered to the 2012 Trusts in late January 2015, which notes were based on the preliminarily determined values of Benson Football and Benson Basketball.

[6]    Exhibits 1-9, promissory notes, ¶ 2.

[7]    *Id.* ¶ 4.

[8]    Exhibits 10-18, collateral assignments, ¶ 3 ("The Assignee shall hold the Collateral as security for the repayment of the Note.").

[9]    *Id.* ¶ 5.

[10]    Exhibits 10-12, Benson Football collateral assignments, ¶ 9 (NFL provision); Exhibits 13-15, Benson Basketball collateral assignments, ¶ 9 (NBA provision).

Trusts").[11] A few years later, in the context of estate planning, the 2009 Trusts purchased certain units of Benson Football from Benson.[12] To finance the purchase, the 2009 Trusts (1) tendered promissory notes to Benson and (2) executed collateral assignment agreements that encumbered the units being purchased so as to collateralize the notes.[13] The substance of that transaction was similar to Benson's proposed substitution, except then, the 2009 Trusts were the debtors and Benson was the creditor.[14] Today, the situation is reversed.

The earlier credit sale to the 2009 Trusts both transferred and encumbered interests in Benson Football. Pursuant to NFL rules, NFL approval was needed for the transfer of the units and for the encumbrance of those units. The NFL ultimately approved the sale and encumbrance of the units, but the approval was subject to a formal agreement signed by all interested parties. The agreement imposed conditions that the lender and borrowers were required to accept, including:

- The lender (Benson) could *not* foreclose upon the units, even in the case of the borrowers' default, without the NFL's prior written consent;[15] and

- The lender (Benson) could *not* sell or assign the trusts' promissory notes without the NFL's prior approval—approval that could be denied in the NFL's "sole and absolute" discretion.[16]

---

[11]   Rec. Doc. 1, Complaint, ¶6.

[12]   *Id*. ¶42.

[13]   *Id*. ¶¶ 43-44.

[14]   NFL Consent Letter, p. 1, attached as Exhibit G to Exhibit 19, Expert Report of David Shearrow (identifying the 2009 Trusts as the "Borrowers" and Benson, the Controlling Owner, as the "Lender"). Another key distinction is that the 2012 credit sale to the 2009 Trusts was a consensual transaction, unlike the attempted substitution at issue here.

[15]   *Id*. at p. 6, §3 ("[T]he Lender shall not Foreclose upon any of the Pledged Interests without the prior written consent of such of the NFL and the NFL member clubs as may be applicable under the NFL Constitution.").

[16]   *Id*. at p. 8, §12 ("[T]he Requesting Parties acknowledge and agree that no interest in the Obligations, the Notes, any Loan Document, this Letter Agreement or any Collateral may be assigned or

The NFL agreement, which bound both lender and borrowers, makes clear that all parties viewed this type of transaction as a "borrowing" or "loan."[17]

### C. Rowe files a Rule 12(c) motion arguing that she had discretion to reject Benson's proposed loan; Benson acknowledges that Rowe has the discretion to reject a loan that has inadequate interest or lacks adequate security.

Rowe and Rosenthal rejected Benson's attempted substitution and tender of promissory notes. Rowe later filed a motion for judgment on the pleadings in which she argued that, pursuant to §13(b) of the 2012 Trust Agreements, she had the discretion to reject Benson's request for a loan from the 2012 Trusts.[18] Rowe argued that the term "loan" must be interpreted according to its meaning under 26 U.S.C. § 675.[19] Under § 675, a "borrowing" or "loan" includes "any transaction in which a trust extends credit to a grantor."[20]

---

otherwise transferred . . . without the prior written consent of the NFL, which consent may be withheld in the NFL's sole and absolute discretion.").

[17] *Id.* at p. 1 ("Purchase Money Loans to RB 2009 Trust, RBL 2009 Trust and RJL 2009 Trust"); *id.* (noting that agreement was entered into as a result of the "borrowing under . . . certain Promissory Note[s] . . . in favor of the Lender evidencing a term loan from the Lender to the [Borrower]"); *id.* at p. 2 ("Borrowers are incurring the indebtedness evidenced by the Notes as purchase money financing for their acquisition of the Pledged Interests . . . ."); *id.* at pp. 3-4 (providing definitions for "Event of Default," "Foreclosure," and "Loan Documents"); *see also* Exhibit 20, Deposition of Dennis Lauscha, Vol. I, p. 84 ("Q. And in this context, we had the borrower—the borrowers were the 2009 trusts; is that right? A. That's what it looks like. Q. And the lender was Mr. Benson himself? A. That's correct. That was for the acquisition of the 2009 stocks or shares."). Where, as here, an exhibit references or refers to monetary terms that are not related to the subjects discussed in this opposition, those unrelated monetary terms have been redacted.

[18] 2012 Trust Agreements, Rec. Docs. 1-6 to 1-8, § 13(b) ("The Trustee shall have the power and the right at any time and from time to time to loan to the Grantor up to 100% of trust assets. Any such loan shall be upon such terms and conditions as are deemed appropriate by the Trustee, including terms which do not provide for adequate interest or security for such loan."); Rowe's memorandum in support of motion for judgment on the pleadings, Rec. Doc. 55-2, pp. 17-22.

[19] Rowe's memorandum in support of motion for judgment on the pleadings, Rec. Doc. 55-2, p. 19.

[20] I.R.S. Tech. Adv. Mem. 8802004 (Sept. 28, 1987), 1987 WL 435734; *see also* Rev. Rul. 85-13, 1985-1 C.B. 194, 1985 WL 286711; *Rothstein v. United States,* 735 F.2d 704, 708 (2d Cir. 1984); 15 U.S.C. § 1602(f) (Truth in Lending Act, defining "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment").

Benson opposed Rowe's motion. He argued that Rowe had the discretion to reject only unappraised notes that bear inadequate interest or security.[21] In doing so, Benson tacitly acknowledged that Rowe had the right to reject a loan that was inadequately secured or lacked proper interest.[22] As a result, even crediting Benson's argument, a denial of Rowe's 12(c) motion would not alter the underlying fact that Benson has requested an extension of credit from the 2012 Trusts. A ruling in Benson's favor would merely create fact issues as to whether the promissory notes bear proper interest and are adequately secured. These topics are a focus of both Benson's and Rowe's expert reports.

### D. Rowe files her witness list on April 1, noting that "[d]iscovery is ongoing" and reserving the right to call "any other defense expert witness disclosed on or before April 15, 2016."

The Court issued a scheduling order in this case. The schedule originally called for the plaintiff to produce expert reports by March 2, the defendants to produce expert reports by April 1, and for all parties to file witness lists on April 1.[23] In other words, the date for witness lists and defense expert reports was originally the same. Thereafter, based on the parties' agreement, the

---

[21]    Benson's opposition to Rowe's motion for judgment on the pleadings, pp. 2, 11-13 (distinguishing notes with adequate interest and security, which are allegedly "property of an equivalent value," from "grantor loans," which are "made *only* to the grantor and then *only* with either inadequate security or inadequate interest, or both" and justifying that distinction because a grantor loan could reduce the value of the trust, while a substitution for equivalent value cannot) (emphasis in original); *id.* at p. 12 ("There is no question that a loan to the grantor without adequate interest or without adequate security, or both, could be to the grantor's benefit and to the detriment of the beneficiaries."); *id.* Part.III.B.3 (improperly distinguishing Rowe's authorities on the basis that they involved notes that provided inadequate security or interest).

[22]    *Id.* at p. 18 ("There are notes that trustees have discretion to refuse (*i.e.*, notes given outside the context of an exercise of the substitution power, which may include unappraised notes bearing inadequate interest or security), and notes trustees have no discretion whether to accept (*i.e.*, notes of equivalent value and with adequate security and interest used to effect an asset substitution).") (emphasis omitted).

[23]    Rec. Doc. 42.

Court extended certain deadlines, including the deadline for submitting expert reports by two weeks.[24] The April 1 witness list deadline, however, remained unchanged.

Rowe filed her witness list on April 1. She noted that she may call "[a]ny other defense expert witness disclosed on or before April 15, 2016,"[25] *i.e.*, the new deadline for submitting defense expert reports.[26] She also indicated that she may call "[a]ny witness deposed in this matter."[27] She further noted that "discovery [was] ongoing" and expressly reserved the right to supplement or amend her witness list prior to the filing of the final pre-trial order.[28] Benson's witness list similarly noted that discovery was ongoing. Like Rowe, he also reserved the right to supplement or amend.[29]

On April 15, in accordance with the Court's scheduling order, Rowe submitted defense expert reports to opposing counsel and to the Court for *in camera* review, thereby disclosing David Shearrow as a testifying expert witness. Shearrow is a retired banker with more than 33 years of experience in lending, credit evaluation, and risk management.[30] On the same day, Rowe produced expert reports by Jeffrey Phillips and Timothy Cummins of Stout Risius Ross, Inc.

On April 18, Benson's counsel contacted Rowe's counsel regarding the scheduling of defense expert depositions, including Shearrow's. Dates were promptly provided. That same day,

---

[24]   Rec. Doc. 77.

[25]   Rec. Doc. 108, ¶ 16.

[26]   Rec. Doc. 77.

[27]   Rec. Doc. 108, ¶ 19.

[28]   Rec. Doc. 108.

[29]   Rec. Doc. 107.

[30]   Exhibit 19, Expert report of David Shearrow; Resume of David Shearrow, attached as Exhibit A. Attached to David Shearrow's expert report are only those exhibits that are cited in this opposition.

Benson's counsel noticed Shearrow's deposition, as well as those of all other defense expert witnesses.[31] Benson's counsel deposed Shearrow during the week of May 2, the same week in which all defense expert witnesses in this case were deposed.[32]

### E.   Shearrow's expert report addresses the risks associated with the proposed extension of credit.

Shearrow relied on his vast experience in the lending industry to analyze this credit transaction. He identified areas of concern about the structure of repayment and vulnerabilities in the collateral, and he considered whether a creditor should be comfortable with that level of risk. Shearrow's report discusses how to underwrite Benson's promise of repayment, especially in terms of risk of default. As outlined in his report, Shearrow will testify about:

- Risks affiliated with the promissory notes and collateral, including the risk of non-payment;

- The non-traditional repayment schedule and difficulties associated with projecting the ability to repay notes due 25 years in the future;

- The absence of standard affirmative and negative covenants, the presence of which would better ensure repayment of the notes;

- Opportunities to impair the collateral that should cause a creditor apprehension with respect to extending credit to a potential borrower;

- Impediments to the creditor's ability to sell or assign the notes; and

- Impediments to the creditor's ability to foreclose on the collateral in the event of default.

---

[31]   Exhibit 21, notice of deposition for David P. Shearrow; *see also* Exhibit 22, notices of deposition for Jeffrey Phillips, Timothy Cummins, Steve Shanker, and Adam Jones (all other defense experts).

[32]   Although the discovery deadline in this case was April 29, counsel informally agreed to extend the period for completing depositions by one week since Benson's expert witness, Kevin Kane, was out of the country for a period of time.

Shearrow will further analyze the more conventional loan structure and security agreement that resulted from Benson Basketball's purchase of the Pelicans (then Hornets).[33] He will explain that the lender in that transaction received far greater protections than the 2012 Trusts would in the attempted substitution.

### F. Benson's expert confirmed that the proposed transaction is an extension of credit and acknowledged that vulnerabilities in the collateral should be taken into account when valuing the notes.

Benson's expert witness, Kevin Kane of Empire Valuation Consultants, also viewed the notes as memorializing an extension of credit in favor of Benson. Kane compared the notes to corporate bonds and mortgage loans.[34] He explicitly evaluated Benson's *creditworthiness* in assessing his ability to make payments on the notes.[35] He even characterized the transaction at issue as a loan:

> In determining the market value of the Notes, a number of factors were considered, including, but not limited to, the Notes' stated interest rate,

---

[33]   Exhibit 19, Expert report of David Shearrow, p. 6 ("One example of a more conventional loan structure in a private arm's-length transaction would be the financing described in the promissory note executed by Thomas Benson, Jr. when he purchased the New Orleans Pelicans from Hornets Interests, LLC. This note was structured with a less than five-year maturity and annual principal installments. In additional, numerous financial and non-financial covenants, and events of default are included in the note providing a form of loan agreement. The accompanying Amended and Restated Pledge and Security Agreement for this loan also addresses many issues, which could affect the future value of the pledged shares. The more conventional structure used in that transaction would be the type of structure a prudent lender would expect to see in the transaction being evaluated here.") (citations omitted); *see also* amended and restated secured promissory note, attached as Exhibit B to Shearrow's report; amended and restated pledge and security agreement, attached as Exhibit C to Shearrow's report.

[34]   Exhibit 23, Renee 2012 Note Report of Kevin Kane (report attached without exhibits), pp. 10-12; *id.* at p. 12 ("The final data point that was used was current mortgage rates. This data point was used because it represented a collateralized obligation that generally had a long maturity (i.e., 30 year mortgages)." Rowe's expert, Jeffrey Phillips, similarly reviewed corporate bonds in valuing the tendered promissory notes.

[35]   *Id.* at p. 8 ("Mr. Benson's overall creditworthiness, or ability to make the required payments is a significant factor in valuing the Notes.").

the Maker's creditworthiness, *the loan* amortization schedule, and risk of repayment.[36]

Furthermore, Kane expressed concern, in response to hypothetical questions, about Benson's ability to undermine the ostensible security interests. For example:

> Q. I want you to assume that Benson Football [pursuant to its Amended and Restated Regulations] could buy the collateral for 75 percent of the collateral's appraised value in the event that Mr. Benson should default on the note. If you assume that for purposes of my question, would that affect the way you would value the note?
>
> A. I suppose it would have an impact, yes.
>
> Q. And the impact would be that you would need to have a higher rate of interest to compensate for that?
>
> A. Correct, because the collateral could be taken away.[37]
>
> \*     \*     \*
>
> Q. When you say that the notes are collateralized, do you assume that the note holder would have essentially a first rank position against the collateral in the event of default?
>
> A. Yes.
>
> Q. Would you assume that the debtor, in this case, Mr. Benson, could not do anything to put someone else in that first rank position and essentially outranked the note holder?
>
> A. Yes.
>
> Q. And if you assume that's not the case, and that the debtor reserved the right to issue additional security interest[s] that would prime the note holder, would that influence your opinion of value?
>
> A. It could, yes.
>
> Q. And it would bring the value down, wouldn't it?

---

[36]   *Id.* (emphasis added).

[37]   Exhibit 24, Deposition of Kevin Kane, pp. 204-05 (omitting form objection).

A. It would require a higher rate of return, yes.[38]

Kane admitted that if (1) Benson reserved the right to issue additional security interests that could prime the 2012 Trusts' interests, (2) Benson Football could buy the collateral (the encumbered units) for 75% of its appraised value should Benson default on the notes, and (3) Benson Football could sell the Saints and distribute the proceeds to Benson, those scenarios would undermine the integrity of the collateral and would need to be considered when evaluating the

---

[38] *Id.* at pp. 202-03; *see also id.* at pp. 205-09 ("Q. Do you know, sir, whether in connection with the Benson Football note payable to the Renee 2012 Trust and the collateral assignment that goes along with it, is there any restriction to the ability of Mr. Benson to cause Benson Football to sell the Saints? A. I don't believe so, no. . . . Q. . . . Is there any restriction on his ability to sell the Saints and then distribute the proceeds as a distribution from Benson Football? . . . A. I don't believe so. Q. I want you to assume that Mr. Benson could cause Benson Football to sell the New Orleans Louisiana Saints, LLC and then distribute the proceeds to himself. If you assume that for purposes of my question, would that influence the way that you valued this note? A. I would say no. I mean he would have liquidity by which to pay that off. Q. Well, what would happen to the collateral in the event that should happen? A. Well, the collateral would obviously disappear because the Saints were sold. Q. And so what happens to the value of Benson Football should the New Orleans Louisiana Saints, LLC be sold and the proceeds distributed? A. If without that asset, obviously the value of Benson Football would decline. Q. And so if the value of Benson Football declines, what happens to the value of the collateral for the note? A. That declines also. Q. And so wouldn't that have to have an effect on the valuation of the note which is secured in units in Benson Football? A. I guess I was working under the assumption that if that were to be the case, then he would take the proceeds from that and pay off the notes. Q. Is he obligated to do that? A. I don't believe he is. Q. And so back to my question, if we assume that Mr. Benson could cause Benson Football essentially to liquidate the New Orleans Saints and then distribute the proceeds to himself, is not the collateral position impaired? A. Yes, it is. Q. And doesn't that mean that it would have an effect on the valuation of that note? A. It would have an impact on the collateral. But the reality is the corresponding impact would be that he would have the liquidity to make the payments on that, so it would be an offsetting factor. Q. So would there be an obligation, though, on the part of Mr. Benson not to give that money away? . . . A. To my knowledge, there is no obligation for him to do that. Q. And so should the New Orleans Louisiana Saints, LLC be sold and the proceeds distributed, essentially the note would become almost unsecured, isn't that right? A. Yes, it would become severely less collateralized. Q. And didn't you tell me before that all things being equal, if you have less collateral, the value of the note is less? A. Yes.") (omitting form objections).

notes.[39] Kane further confirmed that, if the NFL imposed restrictions on the ability of the note-

holder to foreclose on the collateral, that, too, would impact the value of the notes.[40]

### III.   LAW AND ARGUMENT

#### A.   Benson's argument that Shearrow was not explicitly listed on Rowe's April 1 witness list is meritless.

##### 1.   Rowe fully complied with the amended scheduling order.

Benson first argues that, because Shearrow was not specifically identified on Rowe's wit-

ness list, he should be barred from testifying. That argument lacks merit. Benson overlooks that,

whereas the deadlines for exchanging witness lists and defense expert reports were originally on

the same date (April 1), the parties formally agreed to delay the report deadlines by two weeks

(April 15).[41] Rowe fully complied with the amended deadline.

Rowe's April 1 witness list noted that she may call as a witness "[a]ny other defense ex-

pert witness disclosed on or before April 15 2016,"[42] *i.e.*, the deadline for submitting defense ex-

pert reports and more than two months before trial.[43] Rowe further noted that she may call

"[a]ny witness deposed in this matter."[44]

---

[39]   *Supra* notes 37-38 and accompanying text.

[40]   Exhibit 24, Deposition of Kevin Kane, pp. 210-11 ("Q. I want you to assume that the trusts could not foreclose on the Benson Football units without the prior written consent of the National Football League. If you assume that for purposes of my question, would that influence the way you valued this note? A. Yes, it potentially could. Q. And tell me how. A. It would, again, require a higher rate of interest."). Each of these scenarios is equally applicable to Benson Basketball. Benson Basketball has governing documents similar to those of Benson Football, and the NBA—like the NFL—imposes restrictions on the ability to foreclose on units of an NBA team.

[41]   *Compare* Rec. Doc. 42, *with* Rec. Doc. 77.

[42]   Rec. Doc. 108, ¶ 16.

[43]   Rec. Doc. 77.

[44]   Rec. Doc. 108, ¶ 19.

As noted above, Rowe submitted defense expert reports to opposing counsel and to the Court for *in camera* review on April 15, thereby disclosing Shearrow as a defense expert witness. Benson does not contest that Shearrow's report was provided timely.[45]

Less than 72 hours after defense expert reports were submitted, Benson's counsel contacted Rowe's counsel regarding the scheduling of all defense expert depositions, including Shearrow. No timeliness objection was raised. That same day, Benson's counsel noticed Shearrow's deposition, as well as those of all other defense expert witnesses.[46] Benson's counsel deposed Shearrow on May 5, after having taken the depositions of all other defense expert witnesses that same week.

### 2.     Benson suffered no prejudice in any event.

Having stated that Rowe might call any additional expert witnesses she may designate, as well as any individual deposed in this case, Rowe's witness list was not deficient or unclear in any respect.[47] Yet even if the facts were otherwise, Benson's motion would remain meritless for failure to address the governing law. In *Betzel v. State Farm*, the Fifth Circuit articulated four factors to be considered in excluding a late-designated witness: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice."[48] Benson's motion

---

[45]     Memorandum in support of motion *in limine*, Rec. Doc. 136-1, p. 2 & n.1.

[46]     Exhibit 21, notice of deposition for David P. Shearrow; *see also* Exhibit 22, notices of deposition for Jeffrey Phillips, Timothy Cummins, Steve Shanker, and Adam Jones (all other defense experts).

[47]     *See, e.g.*, *Caprio v. American Airlines, Inc.*, 848 F. Supp. 1528, 1534 (M.D. Fla. 1994) ("Defendant requests that this Court strike the designation 'any witnesses called by Defendant' from Plaintiff's Witness list . . . . Plaintiff's listing of 'any witnesses called by Defendant' should not invoke any mysteries. Accordingly, Defendant's Motion to Limit Plaintiff's Witness List is Denied.").

[48]     480 F.3d 704, 707 (5th Cir. 2007).

does not cite this test, much less contend that these factors warrant striking a defense witness. Most importantly, Benson cannot claim to have been prejudiced in any way. Scheduling Shearrow's deposition was no different than scheduling that of any other expert witness. All defense expert depositions were scheduled by Benson's counsel on April 18, and all such depositions were completed during the week of May 2.

The Court should reject Benson's procedural argument, or, solely in the alternative, allow Rowe to file an amended witness list.

### B.   Any denial of Rowe's Rule 12(c) motion would have no effect on the relevance of Shearrow's expert testimony.

#### 1.   The fair market value of Benson's promissory notes is at issue; Shearrow will address risks of nonpayment.

Rowe's Rule 12(c) motion demonstrates that, under the 2012 Trusts, the trustee has the discretion whether to extend credit (or make a loan) to the grantor. Benson disagrees, but not because he denies that the attempted substitution involves an extension of credit. Instead, Benson argues, the trustee may not reject a loan or credit extension when the debtor's promise to repay it is adequately secured and bears market interest.[49]

If the Court grants the motion for judgment on the pleadings, the result will be the dismissal of Benson's claims against Rowe. Should the Court deny the motion, that will leave Benson with the obligation to prove his contentions at trial, including the existence of adequate security and interest for the promissory notes. These questions make expert testimony as to the risk

---

[49]   Benson's opposition to Rowe's motion for judgment on the pleadings, Rec. Doc. 56, p. 18 ("There are notes that trustees have discretion to refuse (*i.e.*, notes given outside the context of an exercise of the substitution power, which may include unappraised notes bearing inadequate interest or security), and notes trustees have no discretion whether to accept (*i.e.*, notes of equivalent value and with adequate security and interest used to effect an asset substitution).") (emphasis omitted).

of the credit extension, and the availability of the collateral in case of default, relevant and important. In fact, Benson's own valuation expert, Kevin Kane, rendered a report in which he (1) evaluated Benson's creditworthiness, (2) assumed that his promissory notes are fully collateralized, and (3) considered interest rates on other debt instruments, including corporate bonds and mortgage loans.[50] In his deposition, Kane acknowledged that defects in the collateral arrangement would increase risk and require a higher rate of interest.[51] Thus, there is a direct correlation between risk and the required rate of interest, two essential considerations in determining the fair market value of the promissory notes.

### 2.   When Benson Basketball bought the Hornets on credit, the creditor obtained far greater protections.

Shearrow, a retired banker with more than 33 years' experience, has studied the transaction documents and formulated opinions as to the credit risks inherent in them. He concludes that the absence of standard loan covenants, among other problems, results in excessive risk to the 2012 Trusts. In contrast to a typical credit agreement, Benson's promissory notes and collateral assignments lack important covenants that restrict a debtor's ability to prejudice the creditor. As Shearrow notes, a good example of such covenants is found in the loan agreement between Benson Basketball and Hornets Interests, LLC. Benson Basketball borrowed a far smaller sum than is at stake here in order to purchase the Pelicans (then Hornets). Yet in that credit sale,

---

[50]   Exhibit 23, Renee 2012 Note Report of Kevin Kane, pp. 10-12; *see also supra* notes 34-36 and accompanying text.

[51]   As noted above, Kane admitted that if (1) Benson reserved the right to issue additional security interests that could prime the 2012 Trusts' interests, (2) Benson Football could buy the collateral for 75% of its appraised value should Benson default on repayment of the notes, and (3) Benson Football sold the Saints and distributed the proceeds to himself, those scenarios would undermine the integrity of the collateral and would need to be considered when evaluating the notes. *Supra* notes 37-39 and accompanying text.

which was amortized over the course of 5 years, Benson Basketball agreed to a host of covenants

that protected the lender's secured position, including, for example:

- Agreeing not to amend or modify its operating agreement or any organizational document without the prior written consent of the lender;

- Agreeing not to create or permit any lien on any of Benson Basketball's assets, including its interest in the team, other than pursuant to the security agreement or the NBA rules;

- Agreeing not to incur any indebtedness, liability, expense or obligation other than taxes or expenses in connection with the maintenance of its organizational existence;

- Warranting that, except for such approvals as have already been obtained and are in full force and effect, no consent or approval of any other person or entity would be necessary to the validity of the pledge and security interest;

- Warranting that, upon the filing of a UCC financing statement, "the Secured Party will have a legal, valid and perfected Lien upon and security interest in the Collateral owned by Pledgor";

- Warranting that all pledged interests are uncertificated and that the pledger shall not cause, permit, or elect to treat any pledged interest as "security" within the meaning of Article 8 of the UCC and shall not issue any certificate representing such interest; and

- Granting the secured party the right to collect all proceeds of any sale or transfer or other disposition of the collateral, including any collateral consisting of cash.[52]

In contrast, in the promissory notes and collateral assignments Benson drafted here—

documents that were in no sense negotiated—similar restrictions are absent. Benson preserves

the right to take on more debt and grant security interests in the same collateral. He may sell assets (for example, the Saints subsidiary) and distribute the proceeds to himself. He may issue ad-

---

[52] Amended and restated pledge and security agreement, §4 "Representations, Warranties and Covenants," and § 8 "Application of Proceeds," attached as Exhibit C to Exhibit 19, Shearrow's report; amended and restated secured promissory note, §5 "Covenants," attached as Exhibit B to Exhibit 19, Shearrow's report.

ditional unit shares in Benson Football and Benson Basketball, thus diluting the trusts' supposed collateral. And, in contrast to the agreement executed to finance the purchase of the Pelicans, Benson did not limit himself from amending the controlling LLC documents in a way that would impair the trusts' position.[53] For these reasons and others, Shearrow concludes that the proposed arrangement carries excessive risk. That risk is not justified by a 4% interest rate. All of these risks are further magnified by an unconventional, 25-year, interest-only repayment schedule. Under Benson's proposal, the trusts would not see one dollar of the principal repaid until the year 2039.

### 3. Shearrow will address credit risk associated with NFL and NBA rules.

Shearrow notes additional problems with the security arrangement. Benson's collateral assignments expressly yield to the NFL and NBA rules.[54] Those rules restrict the transfer or encumbrance of direct or indirect interests in sports teams—interests like those of Benson Football and Benson Basketball. No transfer or encumbrance of units in either company is permissible without the prior written consent of the NFL or NBA. Yet, as Benson's estate-planning lawyer and others have admitted, no such approval exists.[55] Nor have the rules been waived or altered in

---

[53] *Compare* amended and restated secured promissory note and amended and restated pledge and security agreement, attached as Exhibits B-C to Exhibit 19, Shearrow's report, *with* promissory notes and collateral assignments, Exhibits 1-18.

[54] Exhibits 10-12, Benson Football collateral assignments, ¶ 9 (NFL provision); Exhibits 13-15, Benson Basketball collateral assignments, ¶ 9 (NBA provision).

[55] *See, e.g.*, Exhibit 25, Deposition of Paul Cordes, Jr., Vol. II, p. 37 ("Q. And so, they're [the NFL is] not going to start their process until the litigation is concluded? A. Um—probably this litigation that we're in here, yes. Probably not. Q. All right. And then after the litigation is concluded and they start the process, you would understand that they would look for an agreement like the ones we've looked at earlier [for example, NFL Consent Letter, attached as Exhibit G to Exhibit 19]. A. Those are the NFL consent letters? Yeah. Q. Yes, sir. A. They would issue letters to that effect."); *id.* at Vol. I, p. 166 ("Q. So as of today, there is no official approval by the NFL of any substitution? A. No."); *id.* at Vol. II, pp. 61-62 ("Q. And, so my question is, you expect, again, that the NBA will require some type of agreement to memorialize their approval of the transactions that are part of this substitution transaction? A. Yes. Q. Mr. Benson does not have that approval yet, does he? A. Again, he does not have the official approval. Q. And does he have—well,

any way.[56] Noting that the collateral assignments state that the creditors' rights are unenforceable if they conflict with governing league rules, Shearrow points out the serious risk that the 2012 Trusts have no security interest whatsoever in the LLC interests at issue.[57]

As noted above, a mirror image of this transaction (albeit consensual) occurred three years ago. There, Benson sold units of Benson Football to the 2009 Trusts. This was a credit sale. The trusts gave promissory notes to Benson and secured them with the units they acquired. The parties recognized, as did the NFL, that NFL permission was required. But in the process of granting its consent, the NFL extracted major concessions including (1) a formal, written agreement signed by all parties; (2) provisions prohibiting the creditor—there, Benson—from foreclosing on the collateral even if the trusts should default; (3) a provision that the creditor, Benson, could not sell the notes without the NFL's prior written consent, which consent could be withheld in its sole and absolute discretion; and (4) a broad release of the NFL by all parties.[58]

---

let me ask you, is the approval that the NBA gives out an official approval? Do they give out any other kind of approval? A. Um—they give[] out one and only one approval. Q. Okay. A. The formal, official approval. Yes.").

[56] *See, e.g.*, Exhibit 26, Deposition of Vicky Neumeyer (general counsel to the New Orleans Saints), pp. 38-41, 53-54.

[57] Exhibit 19, Expert Report of David Shearrow, p. 7 ("Based on the documents obtained in prior transactions and the stated league rules, it appears that the NFL and NBA must approve, in writing, any transfer of ownership, or collateral pledge of shares. The fact that prior approval has not been obtained from either the NFL or the NBA was validated by Paul Cordes, Jr. in his April 4, 2016 deposition. Therefore, the lender should not be confident that the proposed security interest is valid and enforceable.").

[58] *Id.* at p. 9 ("Furthermore, in the December 31, 2012 NFL letter re: Purchase Money Loans, there is a clear restriction of the lender's ability to foreclose which states, 'the Lender shall not, and shall not have any rights to, Foreclose upon any of the Notes, the Borrowers, the Pledged Interests or any other Collateral without the prior written consent of the NFL.' In his deposition, Paul Cordes, Jr. validated these restrictions and added that a lender could not assign, transfer, or sell a participation interest without the prior written consent of the NFL in its sole and absolute discretion. In addition, Cordes confirmed similar restrictions would apply to the NBA. These limitations should give the lender great concern regarding its ability to foreclose and sell the collateral pledged."); *see also* NFL Consent Letter, attached as Exhibit G to Exhibit 19, Shearrow's report.

Paul Cordes, the principal architect of the attempted substitution, testified that, in all likelihood, the NFL will demand a similar agreement as a condition of approving any transfer or encumbrance of Benson Football units as part of a substitution.[59] No such approval exists.[60] Likewise, Cordes testified that the NBA will require a written agreement before it will consent to the transfer or encumbrance of Benson Basketball units as part of the attempted substitution.[61] Again, no such approval exists. When Benson transferred interests in Benson Basketball to the 2012 Trusts a few years ago, the NBA, like the NFL, approved the transfer on the condition that the parties sign a formal agreement in which they acknowledged their inability to encumber the LLC units without the NBA's permission.[62]

### 4.    Benson's own expert will address credit issues.

Shearrow will address the significance of these points and explain how they impact the risk of repayment in an extension of credit. This testimony is relevant and important to a determination of the fair market value of Benson's promissory notes. Proving the value of the promissory notes is a central component of Benson's case-in-chief. That is doubtless why Benson asked

---

[59]    *Supra* note 55 and accompanying text.

[60]    *Id.*

[61]    Exhibit 25, Deposition of Paul Cordes, Jr., Vol. II, pp. 60-62 ("Q. And would you expect that in connection with this attempted substitution, just as you would need approval of the NFL you would need approval of the NBA? A. Yes. Q. And do you expect it, as well, to be reflected in an agreement signed by all affected parties? A. Um—yes. . . . Q. Well, let me ask you, sir, the document refers to an agreement and undertaking—A. Yeah. Yeah. Q.—you see that? A. Agreement and undertaking. I see. . . .Q. And, so my question is, you expect, again, that the NBA will require some type of agreement to memorialize their approval of the transactions that are part of this substitution transaction. A. Yes.").

[62]    Exhibit 27, Agreement and Undertaking; NBA consent letter (referring to Agreement and Undertaking), attached as Exhibit D to Exhibit 19, Shearrow's report; Exhibit 19, Expert Report of David Shearrow ("In prior transactions when ownership was transferred from Thomas Benson, Jr. to various trusts, formal agreements evidencing approval were obtained from both the NFL and the NBA.").

his valuation consultant to offer opinions about creditworthiness and to determine a rate of inter-est commensurate with the time value of money and the risk of nonpayment.[63] If this were not an extension of credit, Benson's *creditworthiness* would be irrelevant.

      5.    **The same transaction can be both a "loan" and an "asset"; the central question is whether the trusts are extending credit to Benson.**

Whether one calls the trusts' extension of credit a "loan" or an "asset" is a matter of ac-counting semantics. The creditor books a loan as an asset (a "loan receivable" or "note receiva-ble") on its balance sheet. The debtor books it as a debt (a "loan payable" or "note payable").[64] In other words, a right to repayment of a loan or other debt is an asset of the creditor, but that does not change the reality that the creditor has extended credit to the debtor.

There is an inverse relationship between the value of a promissory note and the risk of nonpayment. Shearrow will address the risk of nonpayment and contrast the terms of Benson's promissory note and collateral assignments with commercially acceptable credit agreements. His testimony, along with that of valuation expert Jeffrey Phillips, will establish that Benson's notes are not worth their face value. They are worth far less. Their unusual structure and the absence of standard covenants make them excessively risky, thus requiring a rate of interest higher than 4%.

---

[63]   *See supra* notes 34-35.

[64]   *See, e.g.*, U.S. SMALL BUSINESS ADMINISTRATION, *Preparing Financial Statements* (last visited May 9, 2016), https://www.sba.gov/starting-business/business-financials/preparing-financial-statements.

These facts likely explain why Benson chose not to borrow money from a bank. Benson's executives admittedly considered doing so.[65] They decided instead to make the trusts finance the substitution. Though Benson did not ultimately borrow the money he needed from a financial institution, the fact that he considered doing so confirms that his use of promissory notes memo-

---

[65]    Dennis Lauscha, the president of the New Orleans Saints, testified that Benson and his executives considered going to a bank to obtain financing for the transaction, but ultimately decided to use promissory notes to finance the transaction:

> Q. [W]as there any discussion in your presence about Mr. Benson's borrowing money from a bank or other lender in order to give property of equivalent value to the trusts?
>
> A. In lieu of the promissory notes you're saying?
>
> Q. Exactly.
>
> A. There was some discussion about cash instead of promissory notes to a certain extent, yes.
>
>          . . .
>
> Q. What do you remember about those discussions?
>
> A. You know, we have the Saints that have a pretty large line of credit if we want to go that route. We have the Pelicans, although, you know, pretty heavily leveraged already. We probably could have raised some cash going that route. . . . And to be quite honest with you, we really never have gone out and really tried to leverage up any of his assets, but I know he's had numerous discussions with various banks and bankers who said we will loan you X, Y, and Z if you ever need it. So if we hit the street and really tried to raise some money, we probably could have [done] it. . . . [T]here were numerous discussions we had with regards to how we would finance this.
>
> Q. And who were the bankers who had discussed possibly lending money?
>
> A. Now, I mean, let me be clear here. We had discussions internally about various banks who might step up and do something to help us because they have said many times before they would step up if we ever needed their assistance. . . .
>
> Q. Did you-all ever crunch any numbers and see from these various sources, banks you could compile [hundreds of millions of dollars to reach the total combined amount allegedly owed to the 2009 and 2012 Trusts]?
>
> A. I don't know if we—And if you wanted to overly leverage yourself---Not overly. If you wanted to leverage yourself, you probably could come up with [that amount].

Exhibit 20, Deposition of Dennis Lauscha, Vol. I, pp. 66-70.

rialized an extension of credit. Benson treated the trusts like a bank and, he claims, made them finance the substitution for him.

## IV.   CONCLUSION

Shearrow's testimony is directly relevant to the question of the fair market value of the promissory notes. Benson's own expert will offer testimony regarding this same extension of credit, including Benson's creditworthiness. Nothing about the Rule 12(c) motion will diminish the relevance of Shearrow's testimony. The Court should deny Benson's motion.

Respectfully submitted,

/s/      Thomas M. Flanagan

|  |  |
|---|---|
| S. Mark Murray (admitted *pro hac vice*) | Thomas M. Flanagan (#19569) |
| FORD/MURRAY, PLLC | Camille E. Gauthier (#34558) |
| Union Square II | Charles-Theodore Zerner (#34832) |
| 10001 Reunion Place, Suite 640 | FLANAGAN PARTNERS LLP |
| San Antonio, Texas 78216 | 201 St. Charles Avenue, Suite 2405 |
| Telephone:  (210) 731-6487 | New Orleans, LA  70170 |
| Facsimile:  (210) 731-6401 | Telephone: (504) 569-0235 |
|  | Facsimile: (504) 592-0251 |

Attorneys for Mary R. Rowe, in her capacity as Trustee of the 2012 Trusts

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was served upon all counsel of record this 10th day of May, 2016, by e-filing same into the CM/ECF system, which will automatically deliver a copy of same to all counsel.

/s/      Thomas M. Flanagan